WMN:CAC
F#: 2011R00641/OCDETF #NY-NYE-672

M11-1084

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    - against -<br><br>MICHAEL FARMER,<br>    also known as "Little D,"<br><br>        Defendant. | COMPLAINT AND AFFIDAVIT<br>IN SUPPORT OF APPLICATION<br>FOR ARREST WARRANTS<br><br>(T. 18, U.S.C., §<br>1951(a)) |

- - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

      PETER FITZGERALD, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      In or about and between July 10, 2010 and April 7, 2011, within the Eastern District of New York and elsewhere, the defendant MICHAEL FARMER, also known as "Little D," together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by robbery of two individuals at a residence in Brooklyn, New York of United States currency and narcotics.

      (Title 18, United States Code, Section 1951(a)).

The source of my information and grounds for my beliefs are as follows:

1. I have been a Special Agent with the FBI for approximately 9 years. During my tenure at the FBI, I have participated in many investigations of narcotics trafficking and related violent crimes, including Hobbs Act robberies. In the course of those investigations, I have conducted physical surveillance, monitored undercover operations, debriefed cooperating witnesses and confidential informants, monitored wiretaps, and interviewed civilian witnesses.

2. Because this affidavit is being submitted for the purpose of establishing probable cause to arrest, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. The information set forth below is based upon my experience and training as an FBI Special Agent, my review of documents and other evidentiary items, debriefing of witnesses, and my discussions with other law enforcement agents. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only.

I. **Robbery 1**

3. On or about July 10, 2010, an individual (the "Victim") was robbed in an apartment on Myrtle Avenue in Brooklyn, New York. Law enforcement officers interviewed the Victim immediately following the robbery, and agents subsequently interviewed the Victim on a later date after the robbery. The Victim stated, in sum and substance, that he/she sold narcotics and was expecting a known customer to visit the Victim's apartment the day of the robbery. The Victim further stated that, at approximately 5:45 p.m., the security guard for the apartment building called the Victim and informed him/her that two males were on their way to visit him/her. The Victim instructed the security guard to let the two men up because he/she believed that one of them was the expected customer. When the Victim received a knock at the door, he/she opened the door and two men entered the apartment. The Victim described one of the men, later identified as the defendant MICHAEL FARMER, as skinny, wearing a neck brace, a red baseball hat and having short corn rows in his hair. The defendant MICHAEL FARMER's co-conspirator, the Victim described as taller than the defendant, muscular, and also wearing a red baseball hat.

4. The Victim stated, in sum and substance, that after entering the apartment, the defendant MICHAEL FARMER's co-conspirator held a gun to the Victim's head, and both men pushed

3

the Victim into one of the bedrooms. The defendant MICHAEL FARMER then shot the Victim in the stomach with a taser, which caused the Victim to fall to the ground. The Victim's hands and feet were then bound with zip ties, and a sweater was put over his/her head. After the Victim was placed onto the floor, the Victim was asked questions concerning where the drugs were hidden, and when the Victim did not answer quickly enough, he/she was tasered numerous times by the defendant MICHAEL FARMER. The Victim, fearing for his/her life, eventually told the defendant MICHAEL FARMER and his co-conspirator that narcotics were in the drawer under the stove in the kitchen.

5. The Victim further stated, in sum and substance, that during the robbery, the defendant MICHAEL FARMER became distracted long enough for the Victim to get his/her hands loose. The Victim then jumped up, and leapt out of the window on to a small ledge. While on the ledge, the Victim waved and yelled for help to people on the ground. Members of the New York City Police Department ("NYPD") subsequently arrived and helped the Victim from the ledge.

6. The defendant MICHAEL FARMER and his co-conspirator fled from the scene prior to the NYPD arriving. Following the robbery, surveillance video was obtained by law enforcement of the apartment building entrance from the date and time period of the robbery. The surveillance video showed two

4

men matching the description provided by the Victim entering the building at approximately 5:42 p.m. Neither of the men were carrying anything and both were wearing baseball caps. One of the men was wearing a neck brace. The same two men are also seen on the surveillance camera exiting the building at approximately 6:08 p.m., shortly before the NYPD arrived.[1] The men were towing a suitcase with wheels, as well as some bags.

7. On the day of the robbery, the Victim reported missing two laptops, a coffee maker, a cellular telephone, narcotics, United States currency and a Sony playstation.

8. During a subsequent meeting with the Victim, FBI agents showed the Victim a photographic array from which the Victim identified the defendant MICHAEL FARMER, also known as "Little D," as the individual he believed looked like the man who robbed him wearing a neck brace on July 10, 2010.

---

[1] At approximately 6:07 p.m., two individuals can be seen on the surveillance video reporting something to the security guard. The security guard then ran out of the building just seconds before the defendant and his co-conspirator exited the building.

5

## II. Robbery 2

9.  On or about April 6, 2011, two individuals were robbed in a home on Pulaski Street in Brooklyn, New York. The two victims were found shot multiple times, their hands, feet and bodies bound with duct tape. One of the victims resided at that location and among the items removed from the home were laptop computers and a suitcase. A car leased to one of the victims was also reported missing after the robbery. As explained below, it was later determined that marijuana and U.S. currency were also taken from the home and, upon information and belief, these items were the object of the robbery.

10. NYPD law enforcement officers recovered duct tape from the first floor living room floor. This evidence was submitted to the Office of the Chief Medical Examiner (the "DNA Lab") for DNA analysis. The DNA Lab subsequently determined that there was DNA material contained in the duct tape that was sufficient for analysis.

11. On or about April 7, 2011, NYPD law enforcement officers located the victim's car parked on Downing Street in Brooklyn, New York. A review of several surveillance cameras positioned on the block where the victim's car was found revealed two males (one wearing a baseball hat) parking the victim's car and exiting the car. Surveillance cameras also captured these

6

two individuals going to the entrance of a nearby convenience store. The driver, who was not wearing a baseball hat, was recorded entering the store, where he was seen purchasing a roll of paper towels. The other individual, who was wearing the baseball hat, was recorded standing outside the convenience store, near the entrance. The surveillance cameras subsequently captured the same two males wiping down the victim's car with the paper towels.

12. On May 18, 2011, Khaa McKenzie and Christian John were arrested for the April 6, 2011 robbery and double homicide pursuant to a complaint. Both individuals were subsequently indicted on May 27, 2011. See United States v. John and McKenzie, 11-cr-261 (FB).

A. Background

13. Khaa McKenzie first came to the attention of agents of the FBI during the course of an investigation of a narcotics trafficking conspiracy ring in the Middle District of Pennsylvania. During the course of the investigation, the FBI received information about the organization from a cooperating source ("CS1"), who has proven to be reliable in the past and whose information has been corroborated by independent evidence.

7

CS1 was initially involved in this narcotics conspiracy, but has been cooperating with the FBI since approximately March 2011.[1]

14. In or about February 2011, when CS1 was still a co-conspirator, Khaa Mckenzie provided CS1 with an address in Brooklyn, New York where narcotics shipped from Colombia could be received before being transported to Pennsylvania. The narcotics shipped to that address via FedEx were intercepted en route by law enforcement. On or about March 4, 2011, a male individual called the FedEx office to inquire about the package, not knowing that it had been seized by law enforcement. The telephone number, 908-937-0909, was a cellular telephone registered to the defendant MICHAEL FARMER.

15. On or about April 12, 2011, at the direction of FBI agents, CS1 and another individual met with McKenzie at a pre-determined location to arrange for the purchase of marijuana. That meeting was recorded. During the meeting, McKenzie told CS1 that a few days before, he and _two_ others robbed two individuals at a home on Pulaski Street of marijuana and U.S. currency. McKenzie provided details of the robbery, including information about what was taken from the home. For example, CS1 asked Mckenzie, "how much you came off?" to which the defendant

---

[1] The CS was approached by the FBI during the investigation of the narcotics conspiracy and is cooperating with the hope of receiving leniency for his involvement in the conspiracy. The CS has a criminal record, including convictions for both violent acts and fraud.

8

Mckenzie responded, "22 pounds."[2] Based on my training, experience and knowledge of this investigation, I believe that "22 pounds" is a reference to marijuana, and that 22 pounds of marijuana is consistent with distribution.

16. McKenzie also provided details about one of the robbery crew members taking computers from the robbery location, consistent with what had been reported as stolen. McKenzie stated, "He was the one that fucking ram sacked the whole crib. Making shit mad disgusting" and "come down wit laptops and shit like that." McKenzie also expressed concern about the possibility that stolen laptops could reveal their identities, explaining, "he's a dick head, laptops fucking . . .when he went for the laptop, I told this nigga laptops can be traced nigga." McKenzie further discussed the fact that this co-conspirator was calling him "everyday."

17. CS1 and McKenzie also discussed the sale of the marijuana that was stolen during the robbery. For example, Mckenzie asked CS1, "how many you want?" to which CS1 responded, "How many you got? Find out how many you got. Give me a good number and I'll snatch all of them off of you." Based on my training, experience, knowledge of this investigation and conversations with CS1, I know that Mckenzie and the CS1 were

---

[2] All quotations in this affidavit are based on draft transcripts.

discussing how much of the stolen marijuana the CS1 was going to buy from Mckenzie. I also know, based on my training and experience, that marijuana is grown in many States, as well as outside the United States, and is often transported and sold in interstate commerce.

18. The money that was taken during the robbery was also referenced by McKenzie during this recorded meeting. Mckenzie told CS1 that he stole about "20 stacks a gwap," which, based on my training, experience and knowledge of this investigation, I believe means that he stole approximately $20,000 of U.S. currency.

B.   Identification of MICHAEL FARMER

19. During the course of the investigation, a confidential source ("CS2") informed me that she/he was in the vicinity of Franklin Avenue and Gates Avenue in Brooklyn, NY on April 6, 2011 where CS2 saw Christian John and Khaa McKenzie with an individual known to CS2 as "D."[3]

20. CS2 also provided FBI agents with the cellular telephone number for Christian John. Thereafter, I subpoenaed the call detail records for Christian John's cellular telephone

---

[3]   CS2's criminal history includes a 1999 conviction for criminal possession of a controlled substance (misdemeanor), a 2005 conviction for unlawful possession of marijuana (violation), and a 2010 conviction for criminal possession of stolen property (felony). Other statements that he has made to agents have been corroborated by independent evidence. CS2 has not been charged in this district, but may be charged in the future.

number and discovered frequent calls between Christian John and the same cellular telephone number subscribed to MICHAEL FARMER that was used in the narcotics conspiracy.[4] The call detail records revealed that MICHAEL FARMER was in frequent contact with Christian John on April 6, 2011, the day of the robbery.

21. During the course of the investigation, I showed a photograph of the defendant MICHAEL FARMER to another confidential source ("CS3"). CS3 identified the photograph as a photograph of "Little D."

22. On May 12, 2011, the Honorable Cheryl L. Pollak signed an order authorizing the release of historical cell-site information for the cellular telephone registered to the defendant MICHAEL FARMER for the period March 1, 2011 through April 15, 2011. The historical cell-site telephone phone records from April 6, 2011, the day of the robbery, reveal that MICHAEL FARMER's cellular telephone was in the vicinity of the robbery at the time that the robbery took place. Indeed, MICHAEL FARMER's cell-site location matches the location of the cellular telephone belonging to Christian John.[5]

---

[4] As noted above, on or about March 4, 2011, a male individual using a phone registered to MICHAEL FARMER called FedEx to inquire about a package containing narcotics that was destined to Khaa McKenzie's residence.

[5] On June 23, 2011, the Honorable Victor V. Pohorelsky signed an order authorizing the release of historical cell-site information for Christian John's cellular telephone for the period February 1, 2011 through June 17, 2011.

11

23. In addition, the call detail records for MICHAEL FARMER's cellular telephone reveal that he called Khaa McKenzie at McKenzie's home prior to the robbery, and that there were approximately 48 telephone calls between Christian John's cellular telephone and MICHAEL FARMER's telephone on April 6, 2011. The telephone records further reveal that MICHAEL FARMER made nearly daily calls to telephone numbers associated with Khaa McKenzie following the robbery, which is consistent with McKenzie's April 12, 2011 recorded statement to CS1 that the third robber was calling him everyday.[6]

24. On August 17, 2011, the Honorable Andrew L. Carter, Jr. signed a search warrant for DNA evidence from MICHAEL FARMER, also known as "Little D." On August 24, 2011, I took a buccal swab from MICHAEL FARMER. That swab was submitted to the DNA Lab for analysis.

25. On October 1, 2011, the DNA Lab provided me with a report indicating that MICHAEL FARMER's DNA was a direct match to DNA found on the duct tape at the scene of the robbery.

---

[6] MICHAEL FARMERS's cellular telephone records show that FARMER called McKenzie at his home the morning of the robbery, and then again that night. In addition, FARMER called McKenzie almost everyday from April 7 through April 20. There were a total of approximately 40 outgoing calls to McKenzie during that period, and two incoming calls from McKenzie.

WHEREFORE, I respectfully request that an arrest warrant be issued so that the defendant MICHAEL FARMER, also known as "Little D," may be dealt with according to law.

_____
Peter Fitzgerald
Special Agent
Federal Bureau of Investigation

Sworn to before me this
2nd day of November, 2011

S/Pollak

_____
THE HON.
UNITED ST            E
EASTERN D

13